Slip Op. 21-175

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **PT. KENERTEC POWER SYSTEM,** | |
| Plaintiff, | |
| v. | **Before: Jane A. Restani, Judge** |
| **UNITED STATES,** | **Consol. Court No. 20-03687** |
| Defendant, | **PUBLIC VERSION** |
| **WIND TOWER TRADE COALITION,** | |
| Consolidated Plaintiff and Defendant-Intervenor. | |

## OPINION

[Sustaining the U.S. Department of Commerce's final negative determination as amended on remand in the countervailing duty investigation of utility-scale wind towers from Indonesia.]

Dated: December 28, 2021

Daniel Robert Wilson, and Henry David Almond Arnold & Porter Kaye Scholer LLP, of Washington, DC, argued for Plaintiff PT. Kenertec Power System.  With them on the brief were Jaehong David Park, Henry Bowman Morris, Kang Woo Lee, Leslie Claire Bailey, and Michael Tod Shor.

Elizabeth Anne Speck, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for the Defendant. With her on the brief were Patricia Mary McCarthy, and Joshua Ethan Kurland.  Of counsel was Saad Younus Chalchal, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Robert Edward DeFrancesco, III, Wiley Rein, LLP, of Washington, DC, argued for Defendant-Intervenor Wind Tower Trade Coalition.  With him on the brief were Alan Hayden Price, Daniel Brian Pickard, Derick G. Holt, Elizabeth Seungyon Lee, John Allen Riggins, Laura El-Sabaawi, Maureen Elizabeth Thorson, Robert Edward DeFrancesco, III, Tessa Victoria Capeloto, and Theodore Paul Brackemyre.

Restani, Judge:  Before the court is a motion for judgment on the agency record pursuant

to United States Court of International Trade ("USCIT") Rule 56.2, in an action challenging

findings in both the final determination and the final remand redetermination of the United States

Department of Commerce ("Commerce").  See Utility Scale Wind Towers from Indonesia, 85

Fed. Reg. 40,241 (Dep't Commerce July 6, 2020) ("Final Determination"); Issues and Decision

Memorandum for the Final Determination in the Countervailing Duty Investigation of Utility

Scale Wind Towers from Indonesia, C-560-834, POI: 01/1/2018-12/31/2018 (Dep't Commerce

June 29, 2018) ("IDM"); Final Results of Redetermination Pursuant to Court Remand, ECF No.

43 ("Final Remand Redetermination").  The final determination and final remand

redetermination at issue resulted from Commerce's countervailing duty ("CVD") investigation of

utility-scale wind towers from Indonesia.

The extant issues arising respectively from the final determination and the final remand

redetermination are: 1) whether Commerce's determination that Krakatau POSCO was neither an

authority nor entrusted or directed by the Indonesian government to provide cut-to-length steel

plate ("CTL Plate") to Kenertec at less-than-adequate renumeration ("LTAR") is supported by

substantial evidence, and 2) whether Commerce's determination that the Rediscount Loan

Program is an export subsidy, and thus excluded from the upstream subsidy calculation, is

supported by substantial evidence.  After the final remand redetermination, both the Government

and Plaintiff PT. Kenertec Power System ("Kenertec") maintain that Commerce's determinations

are supported by substantial evidence and in accordance with law.  See PT. Kenertec Resp. to

WTTC R.56.1 Mot. for J. on the Agency Record, ECF No. 31 (July 9, 2021); PT Kenertec Resp.

to WTTC Supp. Br. at 9–10, ECF No. 56 (Sept. 21, 2021); Gov't Op. to R. 56.2 Mot. for J. on

the Agency Record at 59, ECF No. 34 (July 9, 2021) ("Gov't Br."); Gov't Resp. to WTTC Supp.

Br. at 14, ECF No. 55 (Sept. 17, 2021) ("Gov't Supp. Br.")  Plaintiff-intervenor Wind Tower

Trade Coalition ("WTTC") contests Commerce's determinations.  See WTTC Resp. to Kenertec

Mot. for J. on the Agency Record Br., ECF No. 36 (July 12, 2021) ("WTTC Br."); WTTC

Supplemental Brief at 13, ECF No. 56 (Sept. 8, 2021) ("WTTC Supp. Br.").  The court sustains

the final determination as amended by the final remand redetermination.

<h2 style="text-align:center">BACKGROUND</h2>

On July 9, 2019, WTTC submitted a countervailing duty petition to Commerce regarding

imports of wind towers from Indonesia.  See Petitioner's Letter, Petitions for the Imposition of

Antidumping and Countervailing Duties on Utility Scale Wind Towers from Canada, Indonesia,

the Republic of Korea, and the Socialist Republic of Vietnam, C.R. 1−33, P.R. 1−33 (July 9,

2019).  WTTC alleged that an Indonesian wind tower producer had purchased CTL Plate for

LTAR.  See id.

On July 29, 2019, Commerce initiated a CVD investigation of inter alia an alleged

provision of CTL Plate for LTAR.  Utility Scale Wind Towers from Canada, Indonesia, and the

Socialist Republic of Vietnam, 84 Fed. Reg. 38,216 (Dep't Commerce Aug. 6, 2019) ("Initiation

Notice").  The period of investigation ("POI") was January 1, 2018 through December 31, 2018.

Initiation Notice, 84 Fed. Reg. at 38,217.  During the POI, Commerce identified Kenertec as the

only known company with U.S. exports.  Initiation Notice, 84 Fed. Reg. at 38,219. Commerce

found that Kenertec reported it only purchased CTL Plate from PT. Krakatau POSCO ("Krakatau

POSCO") during the POI.  See Kenertec's September 23, 2019 Countervailing Duty

Questionnaire Response at 12 (citing Ex. INPUT-1), C.R. 56−66, P.R. 99 (Sept. 23, 2019)

("Kenertec's Sept. 23 Resp.").  Krakatau POSCO is a joint venture of POSCO, a private Korean

steel company, and PT. Krakatau Steel ("Krakatau Steel"), a government-owned Indonesian

company.  The Government of Indonesia controls Krakatau Steel as the majority shareholder.

See Government of Indonesia's Sept. 27, 2019 Questionnaire Response at 10, C.R. 83−110, P.R.

102−128 (Sept. 17, 2019) ("GOI QR").

On December 13, 2019, Commerce published its affirmative preliminary determination

and found that Kenertec had received countervailable subsidies at an estimated ad valorem net

subsidy rate of 20.29 percent.  Utility Scale Wind Towers from Indonesia: Preliminary

Affirmative Countervailing Duty Determination and Alignment of Final Determination with

Final Antidumping Duty Determination, 84 Fed. Reg. 68,109, 68,110 (Dep't Commerce Dec. 13,

2019) ("Preliminary Determination"); Decision Memorandum for the Preliminary Determination

of the Countervailing Duty Investigation of Utility Scale Wind Towers from Indonesia, C-560-

834, POI 1/1/2018–12/31/2018, P.R. 183  (Dep't Commerce Dec. 6, 2019) ("PDM") at 7–18.

Commerce preliminarily determined that Kenertec's purchases of CTL Plate were a

countervailable financial contribution because it found that the Government of Indonesia had

entrusted and directed Krakatau POSCO to provide CTL Plate for LTAR.  See PDM at 7–16; see

also Government of Indonesia's Nov. 4, 2019, First Supplemental Questionnaire Response at Ex.

GOI-SUPP-3, GOI-SUPP-10, C.R. 148–149, P.R. 156–57 ("GOI SQR").

Two months later, on February 3, 2020, WTTC submitted a timely additional allegation

that CTL Plate producers in Indonesia, including Krakatau POSCO, had received countervailable

upstream subsidies that had passed through to Kenertec.  Letter from Petitioner, Upstream

Subsidy Allegation, C.R. 234–35, P.R. 207–8 (Feb. 4, 2020) ("Upstream Subsidy Allegation").

Court No. 20-03687                                                          Page 5
**Public Version**

Commerce initiated an investigation because it found that the allegation provided a reasonable

basis to believe or suspect the existence of a CVD upstream subsidy under 19 U.S.C. §1677-1(a)

and 19 C.F.R. § 351,523(a)(1).  See Memorandum from Dep't Commerce, Upstream Subsidy

Allegation at 2–9, C.R. 242, P.R. 231 (Mar. 12, 2020) ("Upstream Subsidy Memorandum").

Commerce then decided to defer its upstream subsidy investigation pursuant to 19 U.S.C.

§ 1671b(2)(B)(i) until after the final determination.  See Upstream Subsidy Memorandum at 1–2;

Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam:

Postponement of Preliminary Determinations of Countervailing Duty Investigations, 84 Fed.

Reg. 48,329 (Sept. 13, 2019).

On July 6, 2020, Commerce published its final determination. See Final Determination,

85 Fed. Reg. 40,241l.  Commerce concluded that Krakatau POSCO was not an authority because

the record evidence on balance showed that neither the Indonesian government itself nor

Krakatau Steel exerted meaningful control over the joint venture.  Id.; IDM at 33.  Commerce

also reconsidered the decision to defer its investigation of upstream subsidization of CTL Plate,

see IDM 57–58; Upstream Subsidy Memorandum at 9, and ultimately proceeded with that

upstream subsidy investigation.  See IDM at 59–63.

After briefing before the court, Commerce requested a partial remand to address

Kenertec's argument that the Rediscount Loan Program included in Commerce's upstream

subsidy calculation was an export subsidy not cognizable as an upstream subsidy.  Gov't Mot.

for Partial Voluntary Remand, ECF No. 35 (July 9, 2021).  On July 20, 2021, the court granted

the motion permitting a limited remand proceeding.  Order, ECF No. 38 (July 20, 2021).

Pursuant to the court's order, Commerce filed its final remand redetermination on August 19,

Court No. 20-03687                                                                Page 6
**Public Version**

2021.  <u>See</u> <u>Final Remand Redetermination</u>.  In the final remand redetermination, Commerce

determined that the Rediscount Loan Program was export contingent, excluded the subsidy in the

upstream calculation, and reached a negative CVD determination.  <u>See</u> <u>id.</u> at 6.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C.

§ 1516a(a)(2)(B)(i) (2021).  The court will uphold Commerce's determinations in a

countervailing duty proceeding unless they are "unsupported by substantial evidence on the

record, or otherwise not in accordance with law[.]"  19 U.S.C. § 1516a(b)(1)(B)(i).

**DISCUSSION**

**I.      Commerce Properly Found That Krakatau POSCO Is Neither an Authority
        nor Directed or Entrusted by an Authority**

A subsidy is countervailable if the following elements are satisfied: 1) an authority has

provided a financial contribution directly, or entrusts or directs a private entity to make a

financial contribution; 2) a benefit is thereby conferred on a recipient of the financial

contribution; and 3) the subsidy is specific to a foreign enterprise or foreign industry, or a group

of such enterprises or industries.  19 U.S.C. § 1677(5)(A)–(B), (D)–(E), (5A).  In the final

determination, Commerce found that that the purchases of CLT Plate were not a financial

contribution under the statute, because Krakatau POSCO is neither an "authority" nor a private

entity whom the Indonesian government "entrusts or directs."  <u>See</u> 19 U.S.C. § 1677(5),

(5)(B)(iii).  Commerce and Kenertec find themselves in alignment, and both parties now ask the

court to sustain the Commerce's final determination.  WTTC disagrees and asserts that

Commerce improperly disregarded record evidence in reaching the final determination.  For the

following reasons, the court holds that Commerce's analysis is in accordance with law and

supported by substantial evidence.

### A. Commerce Properly Found That Krakatau POSCO Is not Itself an Authority Within the Meaning of 19 U.S.C. § 1677(5)(B)

Commerce first found that Kenertec was a privately-owned producer of wind towers in

Indonesia, and that Krakatau POSCO was Kenertec's sole Indonesian CTL Plate provider during

the POI.  Kenertec's Sept. 23 Resp. at Ex. INPUT-1; PDM at 8.  In the final determination,

Commerce found that Krakatau POSCO is not an authority under 19 U.S.C. § 1677(5)(B), and

therefore the CTL Plate it sold to Kenertec was not a countervailable financial contribution from

an authority.  Final Determination 85 Fed. Reg. at 40,243; IDM at 31–33.  Commerce considered

evidence regarding the circumstances of Krakatau POSCO's corporate ownership, management

structure, and voting procedures to reach its determination.  See IDM at 31-33; see also GOI QR

at Ex. GOI-CTL-1, Ex. GOT-CTL-3 at Ch. 8, Ex. GOI-CTL-12; GOI SQR at Ex. GOI-SUPP-3.

The statute defines "authority" as "a government of a country or any public entity within

the territory of the country." 19 U.S.C. § 1677(5)(B).  "Public entity," is not a defined term, and

therefore Commerce receives substantial deference in its interpretation.  Borusan Mannesmann

Boru Sanayi ve Ticaret A.S. v. United States, 37 CIT 1276, 61 F. Supp. 3d 1306, 1314 (2015);

see Guangdong Wireking Housewares & Hardware Co. v. United States, 37 CIT 319, 900 F.

Supp. 2d 1362, 1377 (2013), aff'd, 745 F.3d 1194 (Fed. Cir. 2014).  Evidence of government

ownership, although highly relevant, is not dispositive.  See Borusan, 61 F. Supp. 3d at 1320

(finding that the analysis is not "limited to consideration of corporeal voting rights and other

corporate formalities").  In the final determination, Commerce analyzed Krakatau POSCO's

corporate governance structure and cited record evidence in three categories to support its

finding that Krakatau POSCO was not an authority under 19 U.S.C. § 1677(5)(B).  See IDM at

31–33.

To support its finding Commerce first considered Krakatau POSCO's ownership

structure.  Commerce identified Krakatau POSCO as a joint venture of POSCO, a private Korean

steel company, and Krakatau Steel, a majority Indonesian government-owned company.  See

GOI QR at 8-10; IDM at 31–32.  Further, Commerce found that Krakatau POSCO was 70

percent owned by POSCO, with the remaining 30 percent owned by Krakatau Steel.  IDM at 31-

32; see GOI SQR at Ex. GOI-SUPP-3 Art 3.  Commerce concluded that based on ownership

alone, the Krakatau POSCO joint venture was primarily controlled by POSCO, a private

company, not the Government of Indonesia.  IDM at 32.

Next, Commerce considered Krakatau POSCO's management structure, which included a

primary management Board of Directors ("BOD") and supervisory Board of Commissioners

("BOC").  See GOI QR at Ex. GOI-CTL-1; GOI SQR at Ex. GOI-SUPP-3.  The BOD was

comprised of [[      ]] members.  POSCO was authorized to appoint [[      ]] members, and

Krakatau Steel was authorized to appoint [[       ]] members to the BOD.  See GOI QR at Ex.

GOI-CTL-12.  The primary duty of the BOD was to [[

                                                                                ]].  GOI QR at Ex. GOI-CTL-12. The BOD [[


                                  ]]  See GOI SQR at Ex. GOI-CTL-12 Art. 8 (emphasis added).  The

Government of Indonesia further explained that [[

*Confidential Information Omitted*

Court No. 20-03687                                                                    Page 9
**Public Version**

]] <u>GOI QR</u> at 52–53 (emphasis added).

The BOC was comprised of four members. POSCO and Krakatau Steel were each

authorized to appoint [[    ]] members to the BOC.  <u>Id.</u>  Krakatau Steel was also authorized to

nominate the [[                                   ]] whose role was to provide: [[

]] <u>See</u> <u>GOI QR</u> at Ex. GOI-CTL-12 Art. 15

(emphasis added).  In the final determination Commerce found that Krakatau Steel board

members, who served on either the BOD or BOC, did not exert meaningful control over

Krakatau POSCO's operations during the period of investigation.  <u>IDM</u> at 32.

Finally, Commerce considered Krakatau POSCO's voting rights:

> Each director casts one vote and decisions are made [[
>                                            ]] A quorum exists if
> [[
>             ]] If a quorum is not achieved, then [[
> ]], and in the [[                    ]] a quorum exists [[
>
>             ]]

<u>Memorandum from Dep't Commerce</u>, <u>Additional Analysis Regarding the Final Determination</u> at

2, C.R. 263, P.R. 262 (July 1, 2020) (citing <u>GOI QR</u> at 52–53, Ex. GOI-CTL-12) ("<u>Commerce</u>

<u>Final Determination Add'l Analysis Memorandum</u>").  Additionally, certain decisions by the

BOD [[

*Confidential Information Omitted*

Court No. 20-03687                                                      Page 10
**Public Version**

                                                         ]] <u>GOI QR</u> at Ex. GOI-CTL-12 Art. 11.

Considering the Articles of Association and Joint Venture Agreement, Commerce concluded that

Krakatau POSCO's BOD may adopt binding resolutions without any involvement or control

from Krakatau Steel, because POSCO's [[      ]] BOD members represented a majority.

<u>Commerce Final Determination Add'l Analysis Memorandum</u> at 2; <u>see</u> <u>IDM</u> at 32–33.

       WTTC challenges Commerce's determinations on several counts.  Primarily, WTTC

contends that Commerce disregarded record evidence and did not adequately address the role of

the BOC, asserting that Krakatau Steel's presence on the BOC provided it and the Indonesian

government with meaningful control over Krakatau POSCO.  <u>See</u> WTTC Mem. in Supp. of their

R.56.1 Mot. for J. on the Agency Record at 17-19, 26-27, ECF No. 21 (Apr. 7, 2021) ("WTTC

Motion").  Here, the petitioner's argument fails primarily because it overstates the role of the

BOC, and it is plainly incorrect regarding the lack of record evidence to support Commerce's

final determination.  Commerce preliminarily determined that the BOC was the "ultimate

supervisory organ of the company."  <u>PDM</u> at 10; <u>see also</u> <u>Preliminary Determination</u>, 84 Fed.

Reg. at 68,110.  Following further investigation, however, Commerce reasonably determined that

the BOD and not the BOC maintained organizational control of Krakatau POSCO for the reasons

previously stated.  <u>See</u> <u>IDM</u> 32-33; <u>see also</u> <u>Commerce Final Determination Add'l Analysis</u>

<u>Memorandum</u> at 1–2.

       Next WTTC challenged POSCO's comparative strength on both the BOC and BOD if a

quorum is not reached.  WTTC alleges that if a [[                  ]] quorum is not reached for a

BOD meeting; the procedure requires the meeting to be [[

*Confidential Information Omitted*

Court No. 20-03687                                                    Page 11
**Public Version**

     ]] <u>GOI QR</u> at Ex. GOI-CTL-12 Arts. 11, 22.  Under these limited, hypothetical

circumstances, WTTC alleges that the [[                                                    ]] can adopt

binding resolutions "without any involvement of POSCO."  WTTC Motion at 16–17.  WTTC

could point to no record evidence of the minority BOD members exerting control in such a way

during the POI.  Further, the quorum rules still require [[                                   ]] to proceed,

nullifying the argument that minority BOC members can exert control without "any" POSCO

involvement.  <u>See id.</u>; <u>GOI QR</u> at Ex. GOI-CTL-12 Art. 12.  Therefore, Commerce's decision to

consider, and reject, WTTC's argument is reasonable and supported by record evidence.

     Finally, WTTC argued that major operational decisions require [[

     ]] through its 30 percent control of the joint venture.

Commerce did not find WTTC's reasons compelling, citing Krakatau POSCO's Articles of

Association by-laws.  <u>See</u> <u>GOI QR</u> at Ex. GOI-CTL-12 Art. 11; <u>IDM</u> at 32.  Commerce

explained that if the requirement of [[

     ]] <u>See</u> <u>IDM</u> at 32; Gov't Br.

at 20; <u>see also</u> <u>GOI QR</u> at Ex. GOI-CTL-12 Arts. 11, 22.

     Commerce asserts that on balance, the Government of Indonesia, through Krakatau Steel,

did not exert meaningful control over Krakatau POSCO during the POI.  On these facts, the court

cannot say that Commerce erred in its finding that Krakatau POSCO is not a government

authority under 19 U.S.C. § 1677(5)(B).

*Confidential Information Omitted*

Court No. 20-03687                                                                    Page 12
**Public Version**

    **B.  Commerce Properly Found That the Indonesian Government Did Not Entrust or Direct Krakatau POSCO to Provide CTL Plate to Kenertec Pursuant to 19 U.S.C. § 1677(5)(B)(iii)**

       Under 19 U.S.C. § 1677(5)(B)(iii), a countervailable subsidy may be provided by an authority who "entrusts or directs a private entity to make a financial contribution, if providing the contribution would  normally be vested in the government and the practice does not differ in substance from practices normally followed by governments."  19 U.S.C. § 1677(5)(B)(iii).  Commerce asserts that the Statement of Administrative Action Accompanying the Uruguay Round Agreements Act establishes guidance that authorizes Commerce to analyze this issue on a case-by-case basis.  See Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 925–26 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4209, 4239–40 ("SAA").  When there is no direct legislation to entrust or direct private parties to provide a financial contribution, Commerce relies on circumstantial information to determine whether there was entrustment or direction.  See Hynix Semiconductor, Inc. v. United States, 29 CIT 995, 1005–6, 391 F. Supp. 2d 1337, 1347–48 (2005).

       Absent direct evidence that the government entrusted or directed a private entity to provide a financial contribution, Commerce applies a two-part test to examine: "1) whether the government has in place during the relevant period a governmental policy to support the respondent; and 2) whether evidence on the record establishes a pattern of practices on the part of the government to act on that policy to entrust or direct the associated private entity decisions."[1]  Id.  In the final determination, Commerce found that the Government of

---

[1] The prototypical case involves a government implementing "direct legislation to entrust or direct private parties to provide a financial contribution."  Biodiesel from the Republic of Indonesia: Final Affirmative Countervailing Duty Determination, 82 Fed. Reg. 53,477 (Nov. 16, 2017), and accompanying Issues and Decision Memorandum, at 20.

Court No. 20-03687                                                                                      Page 13
**Public Version**

Indonesia's policy to support the wind tower industry during the period of investigation met the

requirements of the first prong.  <u>IDM</u> at 27.  This appears undisputed.  Commerce, however, did

not find an established "pattern of practices" under the second prong.  <u>IDM</u> at 30.  Commerce

ultimately declined to find that the Government of Indonesia entrusted or directed Kenertec

POSCO to provide a countervailable financial contribution.  <u>Id.</u>

      Commerce preliminarily determined that established practices of the Indonesian

government satisfied the second prong of the test.  <u>See</u> <u>PDM</u> at 12.  Commerce based this finding

on the Government of Indonesia's "Master Plan of National Industry Development 2015-2035 of

the Republic of Indonesia" ("RIPIN"); the existence of a plan to develop a steel cluster in a

region of Cilegon as support for Krakatau Steel's significant influence on Krakatau POSCO; and

the alignment of Krakatau POSCO's objectives with government policies.  <u>PDM</u> at 12; <u>see</u> <u>GOI</u>

<u>SQR</u> Ex. GOI-SUPP-10 ("RIPIN") at 19–21).  In the final determination, however, Commerce

reversed its position and found that the Indonesian government had not met the second prong.

<u>IDM</u> at 30.  Commerce adequately supported its new decision with record evidence.

      First, Commerce accepted clarifications from the Indonesian government about the

RIPIN.  <u>See</u> <u>GOI SQR</u> at 18–20; <u>see also</u> Government of Indonesia's Nov. 22, 2019 Second

Supplemental Questionnaire Response at 2–3, C.R. 219, P.R. 180 (Nov. 22, 2019) ("<u>GOI</u>

<u>SSQR</u>").  The Indonesian government submitted a verification report that framed the Cilegon

steel cluster not as a governmental plan, but as a long-term commercial goal independently

established by Krakatau Steel and Krakatau POSCO.  <u>See</u> <u>GOI SSQR</u> at 2–3.  In its

clarifications, the Government of Indonesia described the RIPIN as a non-binding aspiration

guideline, as opposed to a "pattern of practices."  <u>See</u> <u>GOI SQR</u> at 18–20.  Neither the Cilegon

cluster, nor Krakatau Steel or Krakatau POSCO are mentioned in the RIPIN.  <u>GOI SQR</u> at Ex.
GOI-SUPP-1.  Further evidence supports that Krakatau POSCO's long-term commercial strategy
towards the Cilegon cluster was independent of the Government of Indonesia's development
plan because: 1) Krakatau POSCO's business plan towards the Cilegon cluster predates the
RIPIN, and 2) "Krakatau Steel and Krakatau POSCO's crude steel capacity goal remains
unchanged since it was initially set, which suggests there was no attempt to align production with
governmental policies."  <u>IDM</u> at 27–28; <u>see also</u> <u>GOI SQR</u> at 20, Ex. GOI-SUPP-10 at 23–27.

Second, as discussed, Commerce amended its preliminary understanding of Krakatau
POSCO's corporate governance.  <u>Compare</u> <u>Preliminary Determination</u> 84 Fed. Reg. at 68,110.
<u>with</u> <u>Final Determination</u> 85 Fed. Reg. at 40,243; <u>see also</u> <u>IDM</u> at 29.  Commerce found that
Krakatau Steel held a [[                                    ]] ownership of the joint venture Krakatau POSCO
and did not exert control over Krakatau POSCO through either the BOD or the supervisory BOC.
<u>See</u> <u>IDM</u> at 32.  Without this link the finding of entrustment or direction was undermined, and
Commerce's final determination was substantially supported.

## II.      Commerce Properly Reached a Negative Upstream Subsidy Determination

 In its final determination, Commerce found an <u>ad</u> <u>valorem</u> net countervailable subsidy
rate of 5.90 percent for Kenertec.  <u>Final Determination</u>, 85 Fed. Rep. at 40,242. Pursuant to its
decision on remand, Commerce reversed course and reached a negative CVD determination
based on a <u>de</u> <u>minimis</u> subsidy rate.  <u>Final Remand Redetermination</u> at 21–22.  Specifically,
Commerce found that the Rediscount Loan Program, found to be a countervailable subsidy in a
prior proceeding and included in the CVD rate here, was export contingent and therefore not

*Confidential Information Omitted*

eligible to be considered a countervailable upstream subsidy.  Id.  Commerce and Kenertec ask

the court to sustain the final remand redetermination.  Gov't Supp. Br. at 5–8; Kenertec Supp Br.

at 9–10.  WTTC claimed that Commerce's decision to exclude the Redistrict Loan Program in its

upstream subsidy calculation was improper because there is no evidence on this record

demonstrating that the Redistrict Loan Program was an export subsidy.  WTTC Supp. Br. at 3.

 WTTC also posits that if Commerce does not retain the Rediscount Loan Program in the

upstream subsidy calculation or rely on record information as facts available to reach a positive

CVD rate, it must reopen the record and complete a full upstream subsidy investigation.  WTTC

Supp. Br. at 11–12.  WTTC has cited nothing that constitutes such a legal compulsion.  Further,

if Commerce believed its investigation to be inadequate it could have requested a remand to

perform an adequate investigation.  It did not do so; only WTTC seeks this relief.[2]

 An "upstream subsidy" is any countervailable subsidy, other than an export subsidy,

that: (1) is paid or bestowed by an authority with respect to an input product that is used in the

same country as the authority in the manufacture or production of subject merchandise; (2) in

Commerce's judgment bestows a competitive benefit on the merchandise; and (3) has a

significant effect on the manufacturing or production costs of the subject merchandise.  19

---

[2] WTTC also claims that Commerce did not investigate matters it alleged apart from the prior CTL Plate subsidy investigations.  Commerce apparently found inadequate reasons to further investigate the additional matters raised by WTTC.  See Final Remand Redetermination at 18–19.  As indicated, preliminarily Commerce decided to defer the entire upstream subsidy investigation.  At that point, WTTC clearly had the opportunity to withdraw its upstream subsidy allegation and refile its petition if it believed it could better support its allegation or that Commerce simply did not have the time to adequately investigate, as WTTC's allegation was filed late in the investigation, even if timely. See 19 C.F.R. § 351.311(c).  Whether or not WTTC could have withdrawn its petition when it became aware that Commerce decided it could conduct its investigation with prior subsidy results, WTTC apparently did not seek to do so then, or at any other time. Having foregone the remedy available under § 351.311(c) and having accepted the results of the normal but narrow investigative practice of Commerce, it is too late for WTTC to ask the court to compel Commerce to redo its investigation simply because WTTC disagrees with the final determination after remand.

Court No. 20-03687                                                                    Page 16
**Public Version**

U.S.C. § 1677-1(a) (emphasis added).  Therefore, Commerce's classification of the Rediscount

Loan Program as an export-contingent subsidy, if supported, would be fatal to its inclusion in the

upstream subsidy calculation.

      Here, Commerce asserts that information included in the current record regarding the

extent of a countervailable upstream subsidy provided to Krakatau POSCO was either not

available or not able to be verified, and thus it was reasonable to rely on the results of prior

investigations.  Final Remand Redetermination at 6; IDM at 59.  Commerce has promulgated a

practice to rely primarily on previous subsidy findings when conducting an upstream subsidy

analysis.  See Countervailing Duties, 63 Fed. Reg. 65,348, 65,392 (Dep't Commerce Nov. 25,

1998).  As with its initial decision to attribute subsidy rates from previous proceedings to

Krakatau POSCO, Commerce also found that the Rediscount Loan Program was contingent upon

export performance based on previous subsidy findings in CTL Plate from Indonesia and

Extruded Rubber Thread from Indonesia.  See Final Affirmative Countervailing Duty

Determination: Certain Cut-to-Length Carbon-Quality Steel Plate from Indonesia, 64 Fed. Reg.

73,155 (Dep't Commerce Dec. 29, 1999) ("CTL Plate from Indonesia"); Final Negative

Countervailing Duty Determination: Extruded Rubber Tread from Indonesia, 64 Fed. Reg. 14695

(Dep't Commerce Mar. 26, 1999) ("Extruded Rubber Thread from Indonesia"); Final Remand

Redetermination at 8–10.

      WTTC challenges Commerce's methodology here.  WTTC posits that Commerce erred

in removing the Redistrict Loan Program from the upstream subsidy calculation because it is

based on evidence not in the record.  WTTC Supp. Br. at 3–6.  Commerce counters that it has

authority to make a determination on the basis of facts available from other proceedings.  See 19

U.S.C. § 1677e(a)(1), (a)(2)(D); Final Remand Redetermination at 13.  Whether or not

Commerce relied upon "facts otherwise available" as set forth in § 1677e(a), or simply included

facts in the record from previous subsidy findings to determine that the Redistrict Loan Program

is an export subsidy program, substantial evidence supports Commerce's decision.  Commerce

may make a determination based on these facts, because no other facts on the record contradict

them.  See § 1677e(a); Countervailing Duties, 63 Fed. Reg. at 65,392.  Thus, Commerce may

reasonably consider CTL Plate from Indonesia and Extruded Rubber Thread from Indonesia that

concluded that the Redistrict Loan Program was contingent upon export performance.  See

Extruded Rubber Thread from Indonesia, 63 Fed. Reg. at 48,192; CTL Plate from Indonesia, 64

Fed. Reg. at 73,162.

 For its part WTTC provided no evidence contrary to the facts Commerce relied on.  It

makes strained arguments essentially that Commerce can cherry-pick the facts as long as it

reaches a positive CVD rate.  Commerce reasonably relied on a neutral assessment of the facts

on hand to determine that the Redistrict Loan Program was export contingent, and properly

excluded the program from the upstream subsidy rate calculation pursuant to 19 U.S.C. § 1677-

1(a).  Commerce's determination was supported by substantial evidence and in accordance with

law.[3]

**CONCLUSION**

The affirmative CVD determination preliminarily reached was undermined as facts

became available and the law was applied properly.  This may be disappointing to WTTC but

---

[3] Kenertec's outstanding claims that Commerce unlawfully initiated an upstream subsidy investigation, and that
Commerce's upstream subsidy analysis was unsupported by substantial record evidence, are moot.

Court No. 20-03687                                                              Page 18
**Public Version**

Commerce's final negative CVD determination as amended is accordance with the law and is

therefore sustained.  First, the court sustains the final determination finding that Krakatau

POSCO is neither an authority, nor did the Government of Indonesia entrust or direct it to

provide CTL Plate to Kenertec for LTAR.  Second, the court sustains the final remand

redetermination finding that there was no applicable upstream subsidy.


                                                /s/      Jane A. Restani
                                                Jane A. Restani, Judge


Dated: December 28, 2021
        New York, New York